UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PATRICK L. McCANN,

                Petitioner,

                                    CASE NO. 06-12693

v.                                 HONORABLE GERALD E. ROSEN

J. TROMBLEY,

                Respondent.

_____/

### OPINION AND ORDER DENYING HABEAS CORPUS PETITION, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

      Pending before the Court is Patrick L. McCann's *pro se* habeas corpus petition

under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state conviction

and life sentence for a bank robbery in Saginaw Township, Michigan. Respondent

urges the Court to deny relief on the grounds that Petitioner's claims lack merit or are

not cognizable on habeas review. The Court agrees that Petitioner is not entitled to the

writ of habeas corpus. Accordingly, the habeas petition will be denied.

**I. Background**

      Petitioner was tried before a jury in Saginaw County Circuit Court. On December

6, 2002, the jury found him guilty of bank robbery, Mich. Comp. Laws § 750.531. The

robbery occurred at the Chemical Bank on Gratiot Road in Saginaw Township on

October 25, 2001.[1] The facts leading to Petitioner's conviction have been summarized

---

    [1] Petitioner has also been convicted of a bank robbery that occurred in Midland, Michigan on December 5, 2001. That robbery is not the subject of this case, but issues

by the Michigan Court of Appeals as follows:

> Defendant was taken into custody as a suspect in a bank robbery in Midland after his sister told the police that he had admitted robbing the bank. He confessed to the Midland robbery and led the police to evidence located in his mother's house, where he was living at the time. Defendant consented to entry into the home and retrieval of a garbage bag. The garbage bag contained evidence of not only the Midland robbery, but also an earlier robbery of a Chemical Bank in Saginaw Township, including clothing worn by the robber shown in the bank videotape of the robbery. Defendant was subsequently interviewed by an investigator from Saginaw Township, and defendant confessed to the Saginaw bank robbery. The trial court denied defendant's motion to suppress his confession and the evidence retrieved from the garbage bag. Three bank employees testified at the trial and identified defendant as the robber. The videotape of the robbery, and still photographs from the videotape, were admitted as evidence.

*People v. McCann*, No. 246538, at 1 (Mich. Ct. App. Aug. 24, 2004) (unpublished)

(footnote omitted).

Petitioner did not testify or present any witnesses. His defense was that he was guilty of the lesser offense of unarmed robbery. Although he supposedly informed a teller by note that he had a gun, he did not brandish or display a gun and no gun was recovered or visible in the videotape of the robbery.

The trial court sentenced Petitioner as a fourth habitual offender to life imprisonment. The Michigan Court of Appeals affirmed Petitioner's conviction and sentence in an unpublished opinion, *see id.*, and on April 26, 2005, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. McCann*, 472 Mich. 895; 695 N.W.2d 74 (2005) (table).

Petitioner filed his habeas corpus petition on June 19, 2006. His claims are that:

---

related to the Midland robbery arose in this case.

2

(1) his conviction was obtained through the use of a coerced confession and (2) evidence gained from an unconstitutional search and illegal seizure; (3) the state failed to turn over evidence during the discovery phase; (4) he was denied a fair trial by the introduction of evidence of another crime; (5) he was visible to the jury in prison clothes and shackles and (6) his trial attorney was ineffective for failing to seek relief on the basis of that incident; (7) his right to a speedy trial was violated because he was not tried within 180 days of his sentence for the Midland robbery; and (8) his sentence was disproportionate and exceeded the sentencing guideline range.

## II.  Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts

3

of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

"Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original). Furthermore, "§ 2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted).

## III. Discussion

### A. Petitioner's Confession

Petitioner alleges that his conviction was obtained through the use of an involuntary and coerced confession. Petitioner claims to have requested the assistance of an attorney before the police interrogated him, and he contends that the police threatened to arrest his girlfriend and "tear up" his mother's house if he did not confess.

#### 1. Relevant Supreme Court Precedent

The Supreme Court stated in *Miranda v. Arizona*, 384 U.S. 436 (1966), that, prior to any questioning, a suspect

> must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right

> to the presence of an attorney, either retained or appointed.  The
> defendant may waive effectuation of these rights, provided the waiver is
> made voluntarily, knowingly and intelligently.  If, however, he indicates in
> any manner and at any stage of the process that he wishes to consult with
> an attorney before speaking, there can be no questioning.

*Id.* at 444-45.

Although "[n]o single litmus-paper test for constitutionally impermissible interrogation has been evolved," *Culombe v. Connecticut*, 367 U.S. 568, 601 (1961), "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Factors that may be considered when determining whether an interrogation was constitutionally impermissible are:  extensive cross-questioning by the police, undue delay in the arraignment, refusal to permit communication with friends and legal counsel, the duration and conditions of detention, the attitude of the police toward the suspect, the suspect's physical and mental state, and pressures which sap or sustain the suspect's powers of resistance and self-control.  *Culombe*, 367 U.S. at 601-02.  The ultimate test of voluntariness is whether the confession was

> the product of an essentially free and unconstrained choice by its maker[.]
> If it is, if he has willed to confess, it may be used against him.  If it is not, if
> his will has been overborne and his capacity for self-determination
> critically impaired, the use of his confession offends due process.

*Id.* at 602.  "A statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Miranda*, 384 U.S. at 444).

### 2.  The Facts

Detective Donn Clocher of the Midland Police Department testified at a pretrial hearing on November 27, 2002, that he interviewed Petitioner about the Midland bank robbery on December 12, 2001.  He advised Petitioner of his constitutional rights after introducing himself.  Petitioner claimed to understand his rights, and he agreed to talk with Detective Clocher; he did not request an attorney.  Detective Clocher did tell Petitioner that he (Clocher) would have to speak with Petitioner's mother and girlfriend if Petitioner did not want to talk.  Petitioner then admitted his involvement in the Midland bank robbery.  He did not want Clocher to contact his girlfriend or mother.  Petitioner also offered to take Detective Clocher to his mother's house and lead him to evidence of the Midland bank robbery.  Detective Clocher did not threaten to arrest Petitioner's mother or girlfriend or "tear up" his mother's house if Petitioner did not produce the evidence.   Petitioner was not forthcoming the next day when Sergeant Doyle interviewed him about the Saginaw Township robbery.  Detective Clocher then told Petitioner the same thing: if he did not tell the police what he knew about the Saginaw Township robbery, the police would have to question his mother and girlfriend.  (Tr. Nov. 27, 2002, at 34-55.)

Detective Sergeant Jack Doyle testified at the hearing that he interrogated Petitioner about the Saginaw Township bank robbery on December 13, 2001.  Initially, Petitioner was unresponsive to his questions.  Consequently, Sergeant Doyle turned off the tape recorder that he was using, left the room, and consulted Detective Clocher who was in another room.  Clocher than informed Petitioner, that, if the police were not able to gather the information they needed, Sergeant Doyle would have to speak with

6

Petitioner's mother and girlfriend and try to acquire more information about the Saginaw Township bank robbery.  Petitioner subsequently agreed to talk to Sergeant Doyle because he did not want his mother or girlfriend involved.  Doyle advised Petitioner of his *Miranda* rights, and Petitioner stated that he understood his rights and was willing to talk to Sergeant Doyle.  He admitted his role in the Saginaw Township robbery, and he did not request an attorney or ask to terminate the interview.  (*Id.* at 20-34.)

Petitioner testified that, on December 12, Detective Clocher told him that, if he did not cooperate, the police were going to arrest his girlfriend and tear up his mother's house.   On the following day, Sergeant Doyle advised him of his constitutional rights and took a statement from him.  He did not tell Sergeant Doyle that he understood his rights, and when Doyle told him that they were going to talk about another bank robbery, he (Petitioner) informed Doyle that he did not want to be interviewed and did not intend to talk to Sergeant Doyle.  Doyle then turned off the tape recorder, left the room, and came back with Detective Clocher.  Clocher told him that he had no choice in the matter and that, if he did not cooperate, the police were going to arrest his girlfriend and tear up his mother's house.  He requested an attorney before the tape recorder was turned on, but was told that he was not getting one.  He confessed to the Midland bank robbery and volunteered to lead the police to evidence of the robbery because he did not want the police to tear up his mother's house while conducting a search.

The trial court ruled at the conclusion of the pretrial evidentiary hearing that the *Miranda* warnings were properly given and waived and that Petitioner's confession was freely and voluntarily made.  The Michigan Court of Appeals found no error in the trial court's conclusion that Petitioner's statement was voluntary.

7

### 3.  Analysis

Petitioner's testimony at the evidentiary hearing contradicted the police officers' testimony regarding the issue whether he invoked his right to an attorney and his right to remain silent.  Consequently, this Court gives special deference to the trial court's resolution of the credibility issue.  *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).  The trial court's conclusion that the police officers were more credible than Petitioner is entitled to deference because Petitioner stated at the evidentiary hearing that he asked for an attorney and requested permission to go back to his cell while the tape recorder was turned off.  He admitted to the trial court that his subsequent tape-recorded statement did not include a request for counsel or an invocation of the right to remain silent.  (Tr. Nov. 27, 2002, at 75-76.)  Had he really wanted to remain silent, he could have reiterated his request for an attorney and refused to speak with Sergeant Doyle after the tape recorder was turned on.

As for any coerciveness, the Court estimates that Petitioner was 46 years old at the time of the interviews with Detective Colcher and Sergeant Doyle.[2]  He claimed that he did not sleep the night before the interview with Sergeant Doyle, but fatigue does "not automatically render a confession involuntary."  *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990).  Petitioner had no health problems at the time, and he was not suffering from any injuries.  He had earned a high school diploma, and he had completed 70 or 80 credit hours at a community college.  At the evidentiary hearing, he demonstrated that he was an intelligent and articulate person.  By his own admission,

---

[2]  He stated at the evidentiary hearing on November 27, 2002, that he was forty-seven years old.  The interview occurred approximately a year earlier.

8

he had an extensive record of contact with the police, and he had been in custody for only a day.  The interview with Detective Clocher lasted about two and a half to three hours, and the interview with Sergeant Doyle on the following day lasted an hour and a half to two hours.

The totality of the circumstances, including the relatively short interrogation and Petitioner's age, education, good health, and past experience with the police, indicates that Petitioner was not susceptible to pressure from the police.  Petitioner nevertheless contends that the police forced a confession from him by threatening to arrest his girlfriend and "tear up" his mother's house.  He testified at the evidentiary hearing that he did not feel threatened personally by these threats, but he did think the police would harass his mother and girlfriend if he did not confess.

Detective Clocher, however, denied the threats, and Sergeant Doyle confirmed that Detective Clocher had only informed Petitioner that Doyle would seek information from Petitioner's mother and girlfriend if Petitioner did not want to talk.  Seeking information about the crime from other sources would have been completely proper.  And giving Petitioner the option of either telling the police what he knew about the robbery or having the police contact his mother and girlfriend for information about the robberies did not amount to coercive conduct.  The police were free to discuss a reason why Petitioner should cooperate with them, *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989), and "[a]n official who encourages cooperation with the government and who informs the defendant of realistically expected penalties for . . . non-cooperation does not offer an illegal inducement."  *United States v. Myers*, No. 1:08-CR-169-TWT, 2009 WL 597389, at *6 (N.D. Ga. Mar. 5, 2009) (unpublished opinion citing

9

*United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992)).  While there was an appeal to Petitioner's emotions, such appeals do not constitute police coercion, even when the emotional appeal concerns the suspect's family or a loved one. *Crawford v. Vasbinder*, No. 1:05-cv-811, 2009 WL 539931, at *17 (W.D. Mich. Mar. 3, 2009) (unpublished).

The Court concludes that Petitioner's statement was not compelled by Detective Clocher's comment that he would seek information from Petitioner's mother and girlfriend if Petitioner did not reveal information about the robbery.  The comment was not the type of overreaching that is necessary for finding an involuntary confession, because the police were entitled to seek information about the crime from other sources.   Petitioner made a conscious and voluntary choice to confess in order to avoid having the police contact his girlfriend and inconvenience his mother.  There was no constitutionally impermissible conduct.  The state appellate court's decision, therefore, was objectively reasonable.

### B.  The Fourth Amendment Claim

The second habeas claim alleges that the police obtained evidence from an illegal search and seizure.  Petitioner contends that the police entered his mother's home without a warrant and, even though he consented to a search for evidence of the Midland robbery, the police seized items related to the Saginaw Township robbery as well.   According to Petitioner, the search and seizure led to his confession and conviction in the Saginaw Township case.

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. CONST. amend. IV.  The Supreme Court, however, held in *Stone v. Powell*, 428 U.S.

10

465, 482 (1976), that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  For a "full and fair" opportunity to have existed, the state must have provided a mechanism for raising the claim and presentation of the claim must not have been frustrated by a failure of that mechanism.  *Gilbert v. Parke*, 763 F.2d 821, 823 (1985) (citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982)).

Petitioner filed a pretrial motion to suppress evidence that the police obtained during the search of his mother's home where he was living at the time.  The trial court held an evidentiary hearing on Petitioner's motion and then denied it.  Petitioner also raised his claim on appeal.  The Michigan Court of Appeals adjudicated the claim on the merits and rejected it after noting that Petitioner consented to the search and led the police to a garbage bag in an upstairs bedroom of his mother's home.  Although Petitioner argued that he consented only to the search and seizure of evidence related to the Midland bank robbery, the court of appeals concluded that a reasonable person would have understood Petitioner's consent to include the entire contents of the bag.

Petitioner contends that he did not have a full and fair opportunity to raise his claim in state court because the ruling of the court of appeals was defective.  Petitioner maintains that the court of appeals did not rule on the matter of the warrantless entry or the extraneous evidence which was seized and that the court did not take into account the totality of the circumstances when ruling on the issue of consent.

"All that *Stone v. Powell* requires is an 'opportunity' for full and fair consideration

11

of the claim for suppression . . . ."  *Jennings v. Rees*, 800 F.2d 72, 77 (6th Cir. 1986).

Furthermore, the court of appeals expressly or implicitly ruled on the issue of consent

and the extent of Petitioner's consent.  A warrant was not needed because consent to

search was given.   *Groh v. Ramirez*, 540 U.S. 551, 555 (2004); Payton *v. New York*,

445 U.S. 573, 576 (1980).

Petitioner had a full and fair opportunity for presentation of his Fourth

Amendment claim in state court, and there was no failure of the mechanism for raising

his claim.  Therefore, this Court is not required to address the substantive merits of

Petitioner's Fourth Amendment claim.

### C.  Failure to Comply with a Discovery Order; *Brady v. Maryland*

Petitioner alleges next that the prosecution failed to comply with the trial court's

discovery order and failed to disclose or preserve information favorable to the defense.

At issue are (1) the audiotape of Petitioner's confession to Sergeant Doyle, (2) evidence

that bank employees viewed a photographic array shortly after the robbery, and (3)

"burglary kits," which bank employees completed after the robbery.  The Michigan Court

of Appeals adjudicated this claim on the merits and concluded that the untimely

disclosure of information and evidence did not deprive Petitioner of a fair trial.

The alleged violation of a state discovery order is not a cognizable claim on

habeas review.  *Colston v. Burke*, 37 Fed. Appx. 122, 125 (6th Cir. 2002) (unpublished).

However, a prosecutor's suppression "of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963).  A true *Brady* violation has three components:  "The

12

evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985)).

The Due Process Clause requires a different result when the State fails to preserve potentially exculpatory evidentiary material. *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58; *see also California v. Trombetta*, 467 U.S. 479, 491 (1984) (concluding that "the Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce the results of breath-analysis tests at trial").

### 1. The Audiotape

Sergeant Jack Doyle taped Petitioner's confession regarding the Saginaw Township robbery, but no one was able to locate the tape until the third day of trial. Defense counsel had requested the tape to determine whether there was any credence in Petitioner's allegation that his statement was coerced and that the police interrogated him even though he requested an attorney and expressed a desire to remain silent.

There is no indication in the record that the police acted in bad faith when they

claimed to be unable to locate the tape. And no *Brady* error occurred because *Brady*
applies only to a complete failure to disclose, not tardy disclosure during trial, unless the
defendant has been prejudiced by the delay. *Norris v. Schotten*, 146 F.3d 314, 334 (6th
Cir. 1998) (quoting *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986)).
Petitioner was not prejudiced by the delay, because his attorney had a transcript of the
tape, and he was permitted to cross-examine the person who transcribed the tape.
After the police located the tape, and before the tape was played for the jury, defense
counsel was able to listen to it. He concluded from his review of the tape that it was
accurately transcribed. (Tr. Dec. 6, 2002, at 347-48.) Petitioner is not entitled to relief
on the basis of the initial failure to locate and turn over the audiotape.

### 2. The Photographic Arrays

Petitioner alleges that the prosecution failed to disclose the fact that the police
conducted photographic line-ups during their investigation. Petitioner learned about the
photo arrays on the second day of trial when bank employees mentioned a
photographic line-up. The line-up was somewhat favorable to Petitioner because, when
the three bank employees who were present during the robbery viewed it, all three of
them noted that someone other than Petitioner resembled the robber.

During a hearing outside the jury's presence, it was established that there was
no record of the photographic line-up because the police concluded that the person
whom bank employees tentatively identified was not the robber. That person was
arrested on outstanding warrants, and information about the photographic array was
placed in his file instead of Petitioner's case file. (Tr. Dec. 5, 2002, at 243-46, 251-53.)

The bank employees were then recalled, and the attorneys questioned them

14

about the photographic lineup.  The bank employees testified that they had said someone other than Petitioner looked similar to the robber, but was not the robber.

Petitioner's photograph was not included in the array, and the bank employees did not positively identify someone else as the actual robber.  Consequently, there is not a reasonable probability that the result of the proceeding would have been different had the photographic line-up been disclosed to the defense earlier.  Tardy disclosure of the photographic line-up did not prejudice the defense.  Petitioner is not entitled to relief on the basis of his *Brady* claim.

### 3.  The "Burglary Kits"

The "burglary kits" were forms or packets that the bank asked its employees to complete after the robbery.  The kits contained the bank employees' description of the robber.  Petitioner claims that he first learned about the kits when bank employees mentioned them at trial.  He contends that the kits were material evidence concerning the identity of the robber.

There is no evidence that the prosecutor failed to preserve the kits or kept them from defense counsel.  He claimed at trial that he was not aware of the kits until his witnesses testified about them.  He also stated that he could not produce the kits because neither he, nor the Saginaw Township Police Department, had possession of the kits.  (Tr. Dec. 4, 2002, at 229; Tr. Dec. 5, 2002, at 235-37.)  The prosecutor offered to try to find the kits, and they were located before the end of the trial.  Their tardy disclosure did not prejudice Petitioner, because the kits ultimately were admitted in evidence, and defense counsel was given an opportunity to cross-examine the bank employees about the kits and the employees' initial descriptions of the bank robber.

15

For all the foregoing reasons, the Court concludes that the state court's adjudication of Petitioner's claims about the audiotape, the photographic line-up, and the "burglary kits" did not result in a decision that was contrary to, or an unreasonable application of, *Brady*, *Youngblood*, or *Trombetta*. Petitioner has no right to relief on the ground that the prosecution failed to preserve or disclose material evidence.

### D. Other Acts Evidence

Petitioner contends that he was denied a fair trial by the introduction of evidence of the bank robbery in Midland, Michigan on December 5, 2001. Petitioner further alleges that his attorney was ineffective for failing to object to the evidence. The Michigan Court of Appeals stated on review of these claims that there was no error to review because Petitioner himself conceded that the prosecutor could refer to the investigation of the Midland robbery. The court of appeals held that defense counsel was not ineffective in failing to intercede in Petitioner's concession because counsel objected to the prosecution's questions about the Midland robbery and also moved for a mistrial.

This Court finds no merit in Petitioner's claim because

[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence . . . .  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003); *see also Bey v. Bagley*, 500 F.3d 514, 519-23 (6th Cir. 2007), *cert. denied*, __ U.S. __, 128 S. Ct. 1704 (2008).

16

Because there is no Supreme Court decision holding that the admission of "other acts" evidence violates the Constitution, the state courts' rejection of Petitioner's claim cannot be deemed "contrary to" Supreme Court precedent under 28 U.S.C. § 2254(d).

Even if *Bugh v. Mitchell* were not dispositive of the issue, "trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004). The admission of evidence of another robbery was not fundamentally unfair because Petitioner and his attorney invited the error.[3] Petitioner authorized the prosecutor to mention the investigation of the Midland robbery, although not the related conviction (Tr. Dec. 3, 2002, at 12), and his attorney asked Detective Donn Clocher what Clocher was looking for when he opened the garbage bag that Petitioner pointed out to him at his mother's home (Tr. Dec. 5, 2002, at 313-14). Petitioner had promised to show Detective Clocher evidence of the Midland bank robbery. Consequently, defense counsel should have anticipated that Clocher would mention that robbery.

Defense counsel's question to Detective Clocher was a mistake, but counsel's overall performance in connection with the issue was not deficient and did not prejudice the defense. Defense counsel moved *in limine* to preclude any reference to Petitioner's prior convictions, including his conviction for the Midland bank robbery. (Tr. Dec. 3,

---

[3] "The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991) (citing 5 Am. Jur.2d § 713 (1962)).

2002, at 6-7.)  Petitioner then asked defense counsel to inform the trial court that he

was conceding the issue of the investigation of the Midland bank robbery, but he

wanted to suppress the fact that he had been convicted of committing that robbery.

Defense counsel subsequently objected when the prosecutor began to question

Detective Clocher about the Midland robbery.  (Tr. Dec. 4, 2002, at 220-26.)  Defense

counsel objected again when Clocher stated that he was looking for the clothing that

Petitioner wore on the day of the Midland bank robbery.  (Tr. Dec. 5, 2002, at 313-14).

The trial court then instructed the jurors to disregard any reference to another crime.

The court stated that evidence of another crime was not the subject of the pending

litigation and that the jurors were to completely block that information from their minds

and not consider that crime "in any way, shape or form."  (*Id.* at 314.)

     The trial court's cautionary instruction cured the error.  The jury likely was

persuaded by the strength of the evidence against Petitioner (his own confession and

the three bank employees' identification of him), as opposed to evidence of the Midland

bank robbery.  Therefore, defense counsel's error did not prejudice the defense, and

Petitioner's ineffectiveness claim lacks merit.

### E.  Prison Garb and Shackles; Trial Counsel

     Petitioner alleges that he was denied a fair trial when he walked past the jury

room in prison clothes and shackles.  Petitioner further alleges that his trial attorney was

ineffective for failing to request any relief from the trial court.  The Michigan Court of

Appeals found no error requiring reversal and concluded that defense counsel was not

ineffective, absent any factual support demonstrating that Petitioner was prejudiced by

the incident.

18

Compelling a defendant to wear identifiable prison attire at trial can violate the constitutional right to due process because it impairs the presumption of innocence so basic to our adversary system. *Estelle v. Williams,* 425 U.S. 501, 504-05 (1976). Use of visible shackles during the guilt or penalty phases of a trial is forbidden under the Constitution "*unless* that use is 'justified by an essential state interest' - such as the interest in courtroom security - specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624 (2005) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986)) (emphasis in original).

Petitioner appeared in civilian clothes during trial, but during a lunch break on the fourth and last day of trial, a guard took him past the jury room. Petitioner was wearing jail clothes and shackles at the time, and the door to the jury room was open because the jurors were being served lunch. Defense counsel noted the incident for the record after the jury reached its verdict. (Tr. Dec. 6, 2002, at 408-09.)

There is no evidence in the record that the jurors saw Petitioner in prison garb and shackles. Even if they did, the Supreme Court's holding in *Deck* is limited to visible restraints during trial. *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. Oct. 15, 2008). "[T]he Supreme Court has not held that a defendant's constitutional rights are violated when jurors see him shackled during transport to or from the courtroom." *Id.* at 655. As the *Mendoza* court observed, although "there is authority from the [Sixth Circuit] to the contrary, [s]*ee e.g.,* [*United States v.*] *Moreno,* 933 F.2d [362,] 368 [(6th Cir. 1991)], . . . the predicate for [petitioner's] claim -- 'clearly established federal law, as determined by the Supreme Court of the United States' -- is absent here." 544 F.3d at 655-56. Consequently, the state court's conclusion that Petitioner was not denied his right to a

19

presumption of innocence and a fair trial is not contrary to, or an unreasonable application of, *Estelle v. Williams* or *Deck*.

Defense counsel's handling of the matter did not amount to ineffective assistance, because he and Petitioner did not know what effect, if any, the incident had on the jury. Petitioner merely asked defense counsel to mention the incident for the record.

Furthermore, "jurors may well *expect* criminal defendants . . . to be restrained during transport to the courtroom." *Id*. at 655. Thus, even if the jurors saw Petitioner shackled during transport, the presumption of innocence was not necessarily impaired. Any deficiency in defense counsel's performance did not prejudice the defense.

### F. The 180-day Rule

Petitioner alleges that he was denied a speedy trial and his right to due process because he was not tried within 180 days of his incarceration on another charge. Petitioner contends that the trial court lost jurisdiction to hear his case due to violation of the 180-day rule. The trial court and the Michigan Court of Appeals determined that the rule was not violated.

Although Petitioner claims that his right to a speedy trial under the state and federal Constitutions was violated, his argument is based on alleged violations of Mich. Comp. Laws § 780.131(1) and Michigan Court Rule 6.004(D). This statute and court rule grant state prisoners the right to a trial on untried charges within 180 days of notice to the prosecutor that the defendant is detained or incarcerated.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)

20

(*per curiam* opinion).  Consequently, Petitioner's claim under Mich. Comp. Laws §
780.131 and Michigan Court Rule 6.004 is not cognizable on habeas review.  "In
conducting habeas review, a federal court is limited to deciding whether a conviction
violated the Constitution, laws, or treaties of the United States."  *Id.*

Petitioner's claim under the Sixth Amendment to the United States Constitution
also lacks merit.  When determining whether the right to a speedy trial has been
violated in a particular case, the Supreme Court has devised "a balancing test, in which
the conduct of both the prosecution and the defendant are weighed."  *Barker v. Wingo*,
407 U.S. 514, 530 (1972).  Courts ordinarily consider four factors to determine whether
a particular defendant has been deprived of the right to a speedy trial:  the length of the
delay; the reason for the delay; the defendant's assertion of the right; and prejudice to
the defendant.  *Id.*

"The length of the delay is to some extent a triggering mechanism.  Until there is
some delay which is presumptively prejudicial, there is no necessity for inquiry into the
other factors that go into the balance."  *Id.*

> If the length of the delay is not "uncommonly long," then judicial
> examination ends.  *Doggett v. United States*, 505 U.S. 647, 652 (1992).
> The length of the delay is measured from the date of the indictment or the
> date of the arrest, whichever is earlier.  *United States v. Marion*, 404 U.S.
> 307, 320 (1971); *Redd v. Sowers*, 809 F.2d 1266, 1269 (6th Cir. 1987).  A
> delay approaching one year is presumptively prejudicial and triggers
> application of the remaining three factors.  *Doggett*, 505 U.S. at 652 n.1.

*Maples v. Stegall*, 427 F.3d 1020, 1025-26 (6th Cir. 2005).

Petitioner calculates that his trial was delayed for 193 days:  from May 24, 2002,
when he was sentenced for the Midland bank robbery, until December 3, 2002, the first
day of trial in the Saginaw Township case.  Even if the period of delay commenced as

21

early as March 5, 2002, when the criminal complaint was filed in the Saginaw Township

case, the delay was approximately nine months and was not "uncommonly long."  The

Court's inquiry therefore is at an end because the delay was not presumptively

prejudicial under the Sixth Amendment.

### G.  The Sentence

The eighth and final claim alleges that Petitioner's life sentence was

disproportionate to the offense.  Petitioner claims that the trial court (1) incorrectly

scored offense variables 1,2, 9, and 13 of the state sentencing guidelines and (2)

abused its discretion in exceeding the guidelines and sentencing him to life

imprisonment.  Petitioner maintains that the trial court did not have substantial and

compelling reasons, nor an objective and verifiable basis, for exceeding the guidelines.

The Michigan Court of Appeals upheld the trial court's departure from the guidelines

and concluded that the alleged errors were harmless and that the life sentence was not

disproportionate to the seriousness of Petitioner's conduct and his criminal history.

Petitioner's challenge to the state courts' interpretation and application of

Michigan sentencing guidelines is a matter of state concern only.  *Howard v. White*, 76

Fed. Appx. 52, 53 (6th Cir. 2003) (unpublished opinion citing *Travis v. Lockhart*, 925

F.2d 1095, 1097 (8th Cir.1991), and *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir.

1988)).  Consequently, Petitioner has failed to state a cognizable claim for which

habeas relief may be granted.  *Whitfield v. Martin*, 157 F. Supp. 2d 758, 762 (E.D. Mich.

2001).

The contention that Petitioner's sentence is disproportionate lacks merit, because

a plurality of the Supreme Court has held that "the Eighth Amendment contains no

22

proportionality guarantee." *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991). The Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 1001 (Kennedy, J., concurring) (quoting *Solem v. Helm*, 463 U.S. 277, 288 (1983)). "The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003).

Although Petitioner's sentence was harsh, the Supreme Court determined in *Harmelin* that life imprisonment without the possibility of parole for possession of more than 650 grams of cocaine was not cruel and unusual punishment even though Harmelin had no prior felony convictions. Petitioner's criminal history included eight felony convictions, and his sentence does not preclude the possibility of release on parole as Harmelin's did. If Harmelin's sentence was not grossly disproportionate to the offense or the offender, Petitioner's life sentence is not grossly disproportionate. Petitioner has no right to relief on the basis of his sentencing claim.

## IV. Conclusion

The state court's rejection of Petitioner's claims did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly,

IT IS ORDERED that the petition for a writ of habeas corpus [Dkt. #1] is DENIED. Reasonable jurists would not find the Court's resolution of Petitioner's claims debatable or wrong. The Court therefore DECLINES to issue a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The issues do not deserve encouragement to proceed further. Petitioner nevertheless may proceed *in forma pauperis* on an appeal

from this decision because an appeal could be taken in good faith.  Fed. R. App. P.

24(a)(4)(B).




                              s/Gerald E. Rosen_____
                              Chief Judge, United States District Court

Dated:  May 4, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of
record on May 4, 2009, by electronic and/or ordinary mail.

                              s/Ruth Brissaud_____
                              Case Manager